**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**(Indianapolis Division)**

| | | |
|---|---|---|
| CORY BRANDON, KELVIN CHAISSON, DERRICK CHERRY, JARROD BLAKE ROBERTS, JOSEPH WALKER, | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CLASS ACTION COMPLAINT |
| THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE BIG 12 CONFERENCE, INC. a/k/a THE BIG TWELVE CONFERENCE, INC. | § § § § § | No. 1:17-CV-74 |
| *Defendants.* | § § | |

## PLAINTIFFS' ORIGINAL CLASS COMPLAINT

Plaintiffs Cory Brandon, Kelvin Chaisson, Derrick Cherry, Jarrod Blake Roberts, and Joseph Walker, individually and behalf of all others similarly situated, bring this Original Class Complaint complaining of Defendants The National Collegiate Athletic Association ("NCAA") and The Big 12 Conference, Inc. a/k/a The Big Twelve Conference, Inc. ("Big 12"[1] and collectively with the NCAA referred to as "Defendants") and respectfully state:

---

[1] The Big 12 lists its registered name as the "Big Twelve" in its certificate of formation, though it owns a registered trademark for the numerically spelled "Big 12" and markets its self as the "Big 12." *See* http://www.big12sports.com/ViewArticle.dbml?ATCLID=1514841&DB_OEM_ID=10410&DB_OEM_ID=10410. Official Big 12 publications state "[w]hen referring to the Big 12 Conference" the name "should be listed as follows: Big 12" and not "Big XII or Big Twelve." *Id.*

**I.**
**OVERVIEW OF THE ACTION**

No matter the popularity and profitability of any college sport, player safety must come first.  This is especially true of "amateur" college football, which has over the past few decades rivaled the NFL and other professional sports in popularity, and profitability.  Yet Defendants sacrificed player safety—including the Plaintiffs' and the Class's long-term health and well-being—in favor of profits and self-promotion.

**A.     The NCAA.**

1.      The NCAA controls almost every aspect of collegiate football, the nation's most popular collegiate sport, and as a result college football generates hundreds of millions of dollars in annual revenues for the NCAA and its member conferences. In exercising this dominion and control, the NCAA promulgates, and is supposed to enforce through its member conferences, the rules regarding player safety. The NCAA and its member conferences have used this authority to compel all football players to follow the NCAA's policies, rules, and regulations with an iron fist. Unfortunately, the NCAA's (and member conferences') policies in practice and as enforced have severely damaged many of the players the NCAA was supposed to protect, including Plaintiffs.

2.      As the governing body of college football, the NCAA held and holds itself out as the "guardian" of, and ultimate authority on player safety.  It unilaterally acknowledged a duty to provide all players' safety.  Player safety is supposed to be safeguarded with rules, information, and best practices that protect the athletes as much as possible from short-term and long-term health risks. But they did not, because for the past several decades the NCAA and its member conferences placed profits far ahead of player safety.

3.      The NCAA was founded "to protect young people from the dangerous and exploitive athletics practices of the time."[2] According to the NCAA, "[t]he rugged nature of early-day football…resulted in numerous injuries and deaths," prompting President Theodore Roosevelt to convene two White House conferences with college athletics leaders to encourage safety reforms. After several meetings of colleges and universities to initiate safety policies in football, 62 higher-education institutions became charter members of the original NCAA, which was then called the Intercollegiate Athletic Association of the United States (IAAUS).[3]

4.      The NCAA's founding purpose to protect student-athletes, and particularly collegiate football players, has been repeated often, and as far back as 1909 at the annual convention of member institutions. There, Chancellor James Roscoe Day of Syracuse University stated:

> **The lives of the students must not be sacrificed to a sport**.  Athletic sports must be selected with strict regard to the safety of those practicing them.  It must be remembered that **the sport is not the end**. It is incidental to another end far more important. We lose sight of both the purpose and the proportion when we sacrifice the student to the sport.[4]

5.      Likewise, college football conferences, like the Big 12, became organized to facilitate regional competition and profit sharing among member-NCAA schools.

**B.      The Big 12 Conference.**

6.      The Big 12 is one of the largest NCAA member conferences in the United States, headquartered in Irving, Texas.  Founded in 1994, the Big 12 markets itself as "one of the nation's

---

[2] http://www.ncaa.org/wps/wcm/connect/public/ncaa/about+the+ncaa/history.
[3] *Id.*
[4] James Roscoe Day, Chancellor, Syracuse University, The Function of College Athletics, *in* PROCEEDINGS OF THE FOURTH ANNUAL CONVENTION OF THE INTERCOLLEGIATE ATHLETIC ASSOCIATION OF THE UNITED STATES (Dec. 28, 1909), 34-43, at 38, *available at* http://google.com/books?id=dh0LAAAAIAAJ (emphasis added).

premier athletic conferences," and  boasts that it covers "five states with combined populations of more than 38 million people," with "15 of the Top 100" national television markets.[5]

7.      To participate as a member in the Big 12, and to enjoy a share of the huge revenues obtained by the Big 12 and NCAA, each member school must agree to be "fully committed to compliance with the rules and regulations of the NCAA and of the Conference."  Big 12 Bylaws § 1.3.2.  The Big 12 enforces this "commitment" by conducting regular "Compliance Reviews" at each member school.  *Id.* at § 1.3.2.1.  The Bylaws further state that each of its member schools must agree to stay on as a member of the Big 12 for a period of at least ninety-nine years.  *Id.* §1.2.3.  One of the few stated missions of the Big 12 is to "[o]ptimize revenues," which it apparently has been very successful at since the Big 12 has collected and distributed over $2.6 billion in revenue since it was formed, largely from its share of television broadcast licensing agreements, ticket sales, and merchandising.  *Id.* at 1.3.1.4.[6]  Sadly, optimizing player safety is no where to be found in the Big 12's stated missions, though elsewhere it presumes to act to protect player safety and well-being.

**C.      The NCAA and its member conferences (including the Big 12) breach their duties to their student athletes.**

8.      The NCAA and member conferences' role (including the Big 12's) as guardian of player health and safety was supposed to continue up through the present day. The NCAA and member conferences have exercised their role as arbiters of player safety through mandatory rules to regulate the way in which games are played, how players are allowed to behave on and off the field, how schools and conferences are allowed to compete, and how to address issues of player safety.

---

[5] http://www.big12sports.com/ViewArticle.dbml?ATCLID=1514841&DB_OEM_ID=10410&DB_OEM_ID=10410
[6] http://www.big12sports.com/ViewArticle.dbml?ATCLID=1514841&DB_OEM_ID=10410&DB_OEM_ID=10410

9.     During these decades, the NCAA and member conferences controlled what information teams and players received that directly affected the short and long-term health of former players, including the Plaintiffs and the Class.

10.     Over the years the NCAA and its member conferences have assumed a duty to ensure that athletic programs are conducted in a manner designed to protect and enhance the *physical* and educational *well- being* of the student athlete. The NCAA itself claims that "its core mission is to provide student athletes with a competitive environment that is safe" and that the NCAA itself takes "protective steps" with respect to student-athletes' "health and safety." Claiming the mantel of protecting the student athlete in all aspects of the athletic experience, the NCAA has focused on the small and picayune rules violations, ignoring the larger problems that would endanger the profit-making machine that is its dominance of college athletics, like concussions.[7]

11.     Despite the NCAA's and member conferences' assumption of this responsibility for player safety, Defendants were negligent and failed to carry out this duty in that they failed to implement and enforce regulations that would properly protect student-athletes from the risks associated with concussions and/or manage those risks to properly respond to the medically proven fact that repetitive concussions would lead to brain injuries in many football players, including the Plaintiffs and the Class.

---

[7]For example, three football players at the University of Oklahoma exceeded their maximum allowed value of free food (pasta) at a school banquet, and so were required to personally donate the value of the pasta they consumed to a charity of their choice to satisfy their violation of NCAA Bylaw 16.11.1.10).   *See http://mentalfloss.com/article/62221/9-most-absurd-ncaa-violations-recent-memory.*   Similarly,   the   NCAA suspended future Dallas Cowboy star Dez Bryant an entire season for eating a meal at Deion Sanders' home, which wasn't a violation on its own, but since Bryant purportedly lied about the meal to NCAA investigators, his suspension was ordered.   *See http://aarontorres-sports.com/articles/miscellaneous/the-10-dumbest-penalties-in-modern-ncaa-history.html*

12.     By the early-1990s at the latest, the NCAA was aware that the number of concussions was increasing and occurring over a broad range of sports (the Big 12 was aware of this threat when it was formed in 1994). Despite this knowledge, the NCAA and its member conferences suppressed and kept secret from student-athletes, information about the extent of concussion injuries in NCAA college football and their long-term consequences.   Defendants avoided issuing warnings to football student athletes that even one concussion, never mind repeat concussions, could likely result in long-term catastrophic injury and death.

13.     While the NCAA and its member conferences voluntarily assumed the role as the unilateral guardians of player safety, in large part to justify dominance over all aspect of college football, especially on the money side, college football players and their families, including the Plaintiffs, have looked to the NCAA and Big 12 for authoritative guidance on player-safety issues. Student-athletes are usually barely 18 when they begin their athletic careers and are not on anything near equal footing with the NCAA or Big 12 when it comes to understanding the importance of brain injury prevention and treatment.

14.     In its supervisory role, as well as in its position as arbiter of all aspects of college athletics, the NCAA, in concert with the Big 12, has unilaterally and voluntarily chosen how to spend its funds to investigate and regulate many different circumstances affecting player health and safety, including, but not limited to, requiring players to wear certain equipment, designating some player gear as illegal, and deciding what helmet brands should be recognized as the official equipment of the NCAA, among a long list.

15.     No later than the mid-1980s the NCAA was aware of publications in the medical-science community establishing that concussive and sub-concussive injuries to athletes and the general population were a significant risk factor for short-term and long-term neuro-cognitive

health complications, both as single incidents and particularly as repetitive impacts. Despite their knowledge and controlling role in governing player conduct on and off the field, the NCAA and member conferences turned a blind eye to the risk and failed to timely and adequately impose safety regulations governing this health and safety problem.

16. By the early 2000s Defendants were aware of over 20 scientific studies documenting the relationship between concussions and long-term brain injury. These studies recommended prevention, screening, and treatment regimens the Defendants ignored or actively tried to discredit.

17. Defendants failed to meet their legal responsibility to safeguard student-athletes, despite being aware that the NCAA and its member conferences have a "legal obligation to use reasonable care to protect athletes from foreseeable harm in any formal school sponsored activity." Defendants engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by its student-athletes, all the while profiting immensely from those same student-athletes.

18. On average, the NCAA currently rakes in nearly $1 billion in revenue each year from college sports it oversees. The Big 12 itself has collected over $2.6 billion in revenue since it was formed. Unlike the NFL and other professional sports organizations, however, the NCAA and Big 12 do not use revenues to pay their athletes, nor does the money go towards pension or medical benefits for post-collegiate athletes. Student-athletes have no collective bargaining power to negotiate for such benefits, as at least one court recently determined by accepting the NCAA's arguments that college athletes could not collectively bargain. The NCAA gives no medical or financial support to collegiate student-athletes who sustained concussions while playing an NCAA sport and who are then left to cope with the necessary costs and care resulting from their injuries

(although they recently agreed to a class settlement allowing for monitoring over several years for certain former athletes).  The NCAA and Big 12, however, retain the economic benefits resulting from the student-athletes' labors, and the risks that those student athletes, including and especially football players, undertake to play the game from which the NCAA and the conferences, including the Big 12, so clearly profit.

19.    Defendants' conduct is particularly egregious in light of the fact that their policies and procedures – or lack thereof – leave student-athletes like Plaintiffs and the Class wholly unprotected from sustaining brain injuries at a particularly early and vulnerable point in their lives. Unlike professional athletes, who at least have bargaining power through player unions, and some resources to pay for medical care necessitated by head injuries caused during their professional careers (many of which are covered by the recent NFL Concussion Settlement), collegiate players typically range in age from 18-23 and are just beginning their adult lives. For such NCAA student-athletes, including Plaintiffs and the putative class, these injuries have long-term, debilitating effects, ranging from an inability to finish their education, inability to obtain employment, recurring family turmoil relating to impulse control issues, to loss of memory, to depression, and early-onset dementia.  One sad irony arising from Defendants' conduct is that the oft-stated rationale for their exploitation of the so-called "student athletes" for huge profits is that those athletes are benefitting from a college education (often due to partial or total scholarship), but the tragic results to the brain of the players' concussions rob the "student athletes" of even this so-called benefit.

20.    Defendants were in a superior position to know of student-athletes' concussion-injury rates and the long-term medical consequences of concussions. Defendants breached their duty to provide a "safe environment" and specifically failed to warn  players of the long-term risks

associated with repeated concussive and sub-concussive hits, failing to educate players on head injury prevention, failing to timely implement rules of play that would limit head injuries, failing to timely implement return to play rules after concussions occurred, and failing to cover the cost of post-collegiate medical care necessary as a result of the Defendants' bad acts.

## II.
## JURISDICTION AND VENUE

21.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds $5 million, exclusive of interests and costs, and is a class action in which at least one member of the Class is a citizen of a state different from Defendants.  None of the exceptions to jurisdiction listed in 28 U.S.C. § 1332(d)(3) or (4) apply.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) and 1391(c) as the Defendants are deemed to reside in this judicial district because they are subject to personal jurisdiction here; and a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the Defendant conducts substantial business in this jurisdiction.

## III.
## PARTIES

23.     Defendant National Collegiate Athletic Association is an unincorporated association that acts as the governing body of college sports. Its principal office is located in Indianapolis, Indiana, and can be served through its officers Mark Emmert, Joni Comstock, Bernard Franklin, Oliver Luck, Kathleen McNeely, Donald Remy, Cari Van Senus, Bob Williams, located at 700 W. Washington Street, Indianapolis, Indiana 46206.

24.     Defendant The Big 12 Conference, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business in the State of Texas.  The Big 12 may be served through its registered agent for service of process

CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX  75201.  The Big 12 may also be served through its officers where found.

25.     Plaintiff and Class Representative Cory Brandon is a former Big 12 NCAA athlete who played football at the University of Oklahoma from 2006 to 2011.  Mr. Brandon suffered numerous concussions while playing football in the Big 12 and is now suffering from several symptoms indicative of long-term brain and neurocognitive injuries resulting from his college football career.  Mr. Brandon is a resident and citizen of the State of Texas.

26.     Plaintiff and Class Representative Kelvin Chaisson is a former Big 12 NCAA athlete who played football at the University of Oklahoma from 2001 to 2005.  Mr. Chaisson suffered numerous concussions while playing football in the Big 12 and is now suffering from several symptoms indicative of long-term brain and neurocognitive injuries resulting from his college football career.  Mr. Chaisson is a resident and citizen of the State of Texas.

27.     Plaintiff and Class Representative Derrick Cherry is a former Big 12 NCAA athlete who played football at Texas Tech University from 1994-1996.  Mr. Cherry suffered numerous concussions while playing football in the Big 12 and is now suffering from several symptoms indicative of long-term brain and neurocognitive injuries resulting from his college football career.  Mr. Cherry is a resident and citizen of the State of Texas.

28.     Plaintiff and Class Representative Jarrod Blake Roberts is a former Big 12 NCAA athlete who played football at Texas Christian University from 2010-2014.  Mr. Roberts suffered numerous concussions while playing football in the Big 12 and is now suffering from several symptoms indicative of long-term brain and neurocognitive injuries resulting from his college football career.  Mr. Roberts is a resident and citizen of the State of Texas.

29.     Plaintiff and Class Representative Joseph Walker is a former Big 12 NCAA athlete who played football at the University of Texas from 1997-2000.  Mr. Walker suffered numerous concussions while playing football in the Big 12 and is now suffering from several symptoms indicative of long-term brain and neurocognitive injuries resulting from his college football career. Mr. Walker is a resident and citizen of the State of Texas.

## IV.
## FACTUAL BACKGROUND

**A.     The NCAA and Big 12 Had a Duty to Protect and Safeguard Student-Athletes.**

30.     College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which comprise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

31.     The NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for member schools. The NCAA promulgates sport-specific standards through its Playing-Rules Committees, which write the rules for 15 of the 23 men's and women's sports that it regulates. The playing-rules committees are comprised primarily of coaches, who act as consultants to the Association in the event that any "major changes" to the rules are considered. However, the primary responsibility for developing and interpreting the rules falls to the secretary-rules editor.

32.     The NCAA also publishes a Sports Medicine Handbook (the "*Handbook*"), which includes policies and guidelines for the treatment and prevention of injury, as well as return-to-play instruction. The *Handbook* is also produced annually and sent directly to head athletic trainers, as well as various individuals at NCAA member institutions.  It is not sent directly to the entire

athletic trainer staff or to student-athletes, but it is made available online to athletic directors, senior administrators, faculty athletics representatives, other athletic trainers, student- athlete advisory committees at each member institution, and conference commissioners.[8]

**1.      The NCAA Constitution declares that the NCAA will control intercollegiate sports to protect the physical and educational well-being of student-athletes.**

33.      The NCAA Constitution clearly defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes….;
>
> (b) to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;….

NCAA Const., Art.1, § 1.2(a),(b). The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation."[9]

34.      Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides in pertinent part:

> 2.2 THE PRINCIPLE OF STUDENT-ATHLETE WELL- BEING
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well- being of student-athletes.  *(Revised: 11/21/05.)*
>
> *                *

**2.2.3 Health and Safety**. It is the responsibility of each member institution to

---

[8] *Id.*

[9] NCAA Const., Art. 1, § 1.3.2.

protect the health of, and provide a safe environment for, each of its participating student-athletes. *(Adopted: 1/10/95.)*

35.     The NCAA and Big 12 failed to meet this principle as far as concussion prevention and mitigation, especially as to college football players.

36.     In fact, the NCAA Constitution mandates that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience." NCAA Const., Art. 2, § 2.2.1 *(Adopted: 1/10/95)*. The NCAA and Big 12 failed to meet this principle as far as concussion prevention and mitigation, especially as to college football players.

37.     To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations…."[10]

38.     The NCAA, with its member institution the Big 12, has consistently recognized their duty to provide a safe environment for student-athletes. For example, the NCAA's website states: "Part of the NCAA's core mission is to provide student-athletes with a competitive environment that is *safe* and ensures fair play. While each school is responsible for the welfare of its student-athletes, the NCAA provides leadership by *establishing safety guidelines*, playing rules, *equipment standards*, drug testing procedures and *research into the cause of injuries **to assist decision making***."[11]  The NCAA and Big 12 failed to meet this principle as far as concussion prevention and mitigation, especially as to college football players.

39.     Thus, the NCAA maintains The Committee on Safeguards and Medical Aspects of Sports, which is publicly touted by the NCAA as "serv[ing] to provide expertise and leadership to

---

[10] NCAA Const., Art. 2, § 2.8.2.

[11] http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/index.html (last visited Jan. 31, 2013).[emphasis added]

the NCAA *in order to provide a healthy and safe environment for student-athletes* through research, education, collaboration and policy development."[12] The NCAA and Big 12 failed to meet this principle as far as concussion prevention and mitigation, especially as to college football players.

40.    One of the NCAA's "core concepts and priorities" was to use its knowledge to promote health and safety, but again failed their student athletes despite this knowledge:

> The NCAA has been conducting injury surveillance for more than 20 years. Over time, the underlying principle of the program has remained unchanged – to promote and support student athlete health and safety.

41.    In fact, the NCAA explains on its website how it promises to use the injury surveillance data it collects:

> How does [the injury surveillance data] help prevent sports injuries?
>
> Once we know how they occur we can take the necessary steps to reduce student-athletes' exposure to situations that cause injuries. For instance, we can make adjustments to rules – such as eliminating tackling techniques in football or high-sticking in ice hockey – to reduce situations that expose student-athletes to high risks of injury. Or we can adjust equipment requirements and standards to increase safety.[13]

> 3.    The NCAA promulgates annual guidelines for the protection of student- athletes' health and well-being.

42.    On an annual basis, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports publishes the Handbook "to formulate guidelines for sports medicine care and protection of student-athletes' health and safety" and "to assist member schools in developing a safe intercollegiate athletic program"[14] The Medical Committee recognizes that the Handbook "may constitute some evidence of the legal standard of care." The Handbook expressly recognizes

---

[12] http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/.[emphasis added]
[13] http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/Sports+Injuries/.
[14] The 2010-11 NCAA Sports Medicine Handbook, at 2.

that "student-athletes *rightfully assume* that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."[15]

43.    In discussing the "Shared Responsibility for Intercollegiate Sports Safety," the NCAA states that:

> In an effort to do so [i.e. take reasonable precautions to minimize the risks of injury from football players], the NCAA collects injury data in intercollegiate sports. When appropriate, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports makes recommendations to modify safety guidelines, equipment standards, or a sport's rules of play.[16]

44.    Thus, the NCAA has described, time and again, its responsibility for the health and well-being of student-athletes, and the Big 12 demands that each of its players and institutions closely follow the NCAA rules and guidelines to accomplish this duty.

**B.    Primer on Concussions.**

**1.    Concussions and what they cause.**

45.    The brain is made of soft tissue and is cushioned by spinal fluid. It is encased in the hard, protective skull. When a person gets a head injury, the brain can slosh around inside the skull and even bang against it. This can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves. When this happens, a person can get a concussion – a temporary loss of normal brain function.

46.    A concussion or mild traumatic brain injury ("MTBI") has been defined as "a complex pathophysiological process affecting the brain, induced by traumatic biomechanical forces." In simple terms, a concussion is an injury to the brain that may result in temporary or permanent loss of normal brain function.

---

[15] *Handbook*, at 4 (emphasis added).
[16] *Handbook*, at 4.

47.     The milder indications of a concussion include headaches, lack of concentration, problems with memory and judgment, lack of coordination and difficulty with balance. The more significant effects can include Post-Concussion Syndrome ("PCS"), Chronic Traumatic Encephalopathy ("CTE") and Second Impact Syndrome ("SIS").

**2.     Signs and symptoms of concussions.**

48.     Although a concussion is commonly perceived as causing loss of consciousness (passing out), a person can have a concussion and never lose consciousness. As the Big 12 and the NCAA know or should know, symptoms of a concussion may include:

> "seeing stars" and feeling dazed, dizzy, or lightheaded;
>
> memory loss, such as trouble remembering things that happened right before and after the injury;
>
> nausea or vomiting; headaches;
>
> blurred vision and sensitivity to light;
>
> slurred speech or saying things that don't make sense; difficulty concentrating, thinking, or making decisions;
>
> difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks); and
>
> feeling anxious or irritable for no apparent reason; or feeling overly tired.

49.     The general public, including former football players, may not recognize the signs of a concussion. In fact, a concussion may prevent a player from recognizing that one has a concussion, or the lingering symptoms, since by definition a concussion is brain impairment. And because of that, student-athletes may put themselves at risk for another injury. For example, players may return to a game before they should, thinking nothing is wrong. That is a problem because if a player's brain has not healed properly from a concussion and the player then receives another brain injury (even if it is with less force), it can be serious.

50.     Repeated injury to the brain can lead to swelling, and sometimes people develop long-term disabilities, or even die, as a result of serious head injuries. It is therefore very important to recognize and understand the signals of a concussion.

51.     When post-concussion symptoms persist beyond a month, most refer to this condition as post-concussion syndrome (PCS). PCS symptoms can include headaches, fatigue, memory problems, feeling in a fog, depression, impulsivity, and other physical, cognitive, mood, and behavioral problems.

### 3.     Chronic Traumatic Encephalopathy or CTE.

52.     CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain which eventually leads to dementia and other neurological disorders. Often there can be a delay of years or even decades between the end of the repetitive head impacts (*i.e.*, the end of playing football) and the beginning of the symptoms. CTE often presents with recent memory loss and other cognitive impairments similar to those experienced by people with Alzheimer's disease. People with CTE can also have changes in behavior (*e.g.,* impulsivity, rage, aggression, having a short fuse) and mood (*e.g.,* depression, hopelessness, feeling suicidal).

### 4.     Second-Impact Syndrome or SIS.

53.     When athletes who have sustained a concussion return to competition too soon, they risk the occurrence of SIS, a condition that can cause serious head trauma or even death.[17] SIS occurs when an athlete sustains a second blow to the head before the symptoms from the first

---

[17] *See AAN Statement* at 581 (recognizing cumulative damage of multiple concussions); *Handbook*, *supra* ¶ 37, at 53 ("There are potentially serious complications of multiple or severe concussions, including second impact syndrome, postconcussive syndrome, or post-traumatic encephalopathy"); *see also* Sean Gregory, *Study: Kids Competing Too Soon After Concussions*, TIME (Jan. 21, 2009), http://www.time.com/time/magazine/article/0.9171. 1873131,00.html (reporting on concussion study by the Center for Injury Research and Policy at Nationwide Children's Hospital that found half of concussed student-players returned too soon to play).

concussion have subsided, or before the brain has fully recovered. The second injury may occur within minutes, days, or even weeks after the first, and still have a devastating effect.

54.    Even a relatively light hit, if sustained during this vulnerable post-concussion period, may spark the onset of SIS. The second impact causes rapid swelling of the brain, resulting in cerebral edema. When the brain swells, the pressure inside the skull increases, preventing blood flow to the brain and decreasing the brain's essential oxygen levels, causing substantial injury or death.[18]

**5.    The brain.**

55.    The brain has three main parts – the cerebrum controls higher mental functions, such as thought, memory, and language; the cerebellum controls balance and coordination; and the brainstem controls bodily function such as breathing, heart rate, and blood pressure.

56.    A number of structures surround the brain to keep it safe. It is encased in the skull to protect it from outside sources; it has supporting tissues to help stabilize it; and, it is covered on all sides by three membranes and a layer of fluid. For this reason, it is often said that the brain "floats" inside the skull.

57.    As a result, injuries to the brain occur when the head suddenly stops moving, but the brain, which was traveling at the same speed as the head, continues to move and strike the inside of the skull, transferring part of the force to the brain. This occurs most commonly when a blow is given to the head, and can also occur when the head is forced to accelerate or decelerate rapidly which can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves. When this happens, a person can get a concussion – a temporary loss of normal brain function.

---

[18] Cantu RC: Second Impact Syndrome a risk in any contact sport. *Physician and Sports Medicine* 23:27 (1995); see also, *Brain and Nervous System Health Center: Brain Swelling,* WebMD, http://www.webmd.comlbrainlbrain-swelling-brain-edema-intracranial-pressure?print=true (last updated Mar. 2, 2010) (describing brain swelling).

58.     The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

**6.      After a concussion.**

59.     After a concussion, the brain needs time to heal until all symptoms of a concussion have cleared up before returning to normal activities. The amount of time someone needs to recover depends on how long the symptoms last. Healthy teens can usually resume their normal activities within a few weeks, but each situation is different. A doctor should monitor the athlete closely to make sure it is appropriate to return to the game.

60.     Someone who has had a concussion and has not recovered within a few months is said to have post-concussion syndrome. The person may have the same problems described earlier – such as poor memory, headaches, dizziness, and irritability – but these will last for longer periods of time and may even be permanent.

61.     If someone has continuing problems after a concussion, the doctor may refer him or her to a rehabilitation specialist for additional help.

**C.      Long-Term Effects of Concussions.**

62.     Several major studies of the long-term effects of concussions have been conducted by Boston University's Center for the Study of Traumatic Encephalopathy, the Brain Injury Research Institute, the Veterans' Administration, and other institutions. These studies have

revealed the "devastating consequences" of repeated concussions, including an increased risk of depression, dementia, and suicide.

63.     Further, the studies have demonstrated the physiological effect of multiple hits on the brain, manifested by red flecks of protein deposits on the brain called present with CTE. Generally, these proteins appear when the brain is hit, and disappear as healthy brain cells devour them, leading to recovery. Yet, when the brain suffers too many blows, the brain cells cannot keep up with the protein and eventually give up and die, leaving just the red flecks associated with CTE.

64.     Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Four of the five brains showed "the telltale red flecks of abnormal protein" characteristic of CTE. Dr. McKee, of the Boston University Center has examined the brains of 16 former athletes, and found CTE in all of them. Their research demonstrates how devastating multiple concussions are to the brain and to human function, and reiterates the need for concussion awareness, management, and prevention.

65.     Published peer-reviewed scientific studies have long shown that concussive and sub-concussive head impacts while playing football are linked to significant risk of permanent brain injury. This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue. The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and eventually, progressive dementia.  As discussed in detail below, these publications have been available to the NCAA and member conferences for years, yet they failed to act in accordance with their duties to protect their players and warn them of the long-term.

66.     Most recently, the NFL, which for years disputed evidence that its players had a high rate of severe brain damage, stated in federal court documents that it expects nearly a third of retired players to develop long-term cognitive problems and that the conditions are likely to emerge at "notably younger ages" than in the general population. The NFL has agreed to a class settlement offering certain players with probable diagnoses of one or more long-term brain injuries compensation (between $1.5 million/player for the least severe, up to $5 million for Lou Gehrig's Disease). *See* Case No. 2:12-md-02323 (E.D.Pa.).[19] In addition, the NCAA has agreed to a class settlement for medical monitoring only of former NCAA athletes from a fund of up to $75 million, though no portion of that fund is to be paid for personal injuries to the athletes or even for their ongoing medical care.  *See* Case No. 1:13-CV-09116 (N.D. Ill.).

**D.     Studies Ignored by the NCAA and Big 12.**

67.     For decades, the NCAA and Big 12 have been aware that multiple blows to the head can lead to long-term brain injury, including, but not limited to, memory loss, dementia, and depression.

68.     In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] … if they ke[pt] at the game long enough" (the "Martland study"). The article was published in the *Journal of the American Medical Association*. The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

69.     In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

---

[19] *See also* https://nflconcussionsettlement.com/Home.aspx

70.     In 1952, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.*, recommending that players cease to play football after receiving their third concussion).

71.     A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

72.     In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

73.     A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion. The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

74.     In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram. By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

75.     In 1973, a potentially fatal condition known as "Second Impact Syndrome" – in which re-injury to the already concussed brain triggers swelling that the skull cannot accommodate – was identified. It did not receive this name until 1984. Upon information and belief, Second

Impact Syndrome has resulted in the deaths of at least 40 football players. The NCAA and Big 12 knew or should have known of this study and information, yet chose to ignore it.

76.     Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;
>
> encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;
>
> acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;
>
> with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
>
> immediate retrograde memory issues occur following concussions;
>
> mild head injury requires recovery time without risk of subjection to further injury;
>
> head trauma is linked to dementia;
>
> a football player who suffers a concussion requires significant rest before being subjected to further contact; and,
>
> minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

The NCAA and Big 12 knew or should have known of this study and information, yet chose to ignore it.

77.     In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained mTBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.  The NCAA and Big 12 knew of should have known of each of these studies, yet chose to ignore them.

78.     In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered mTBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve. The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.  The NCAA and Big 12 knew of should have known of each of these studies, yet chose to ignore them.

79.     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published *Concussion Grading Guidelines*, which he later updated in 2001.

80.     By 1991, three distinct medical professionals/entities – Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society – developed return-to-play criteria for football players suspected of having sustained head injuries. The NCAA and Big 12 knew of should have known of each of these studies and criteria, yet chose to ignore them.

81.     A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999,

except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths. From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

82.      In November 2001, the first international symposium on concussion in sport was held in Vienna. The goal was for a group of experts to provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries. The consensus statement recommended return-to-play guidelines and that when a player shows any symptoms or signs of a concussion: "(1) the player should not be allowed to return to play in the current game or practice; (2) the player should not be left alone; and regular monitoring for deterioration is essential; (3) the player should be medically evaluated after the injury; (4) return to play must follow a medically supervised stepwise process."

83.      The statement also recommended a return to play stepwise process as follows:

"(1) no activity, complete rest.  Once asymptomatic, proceed to level (2); (2) light aerobic exercise such as walking or stationary cycling; (3) sport specific training – for example, skating in hockey, running in soccer; (4) non contract training drills; (5) full contact after medical clearance; (6) game play." The statement also recommends education of athletes is "a mainstay of progress in this field."

84.      The NCAA and Big 12 failed to act on these recommendations.

85.      Research studies were published in November, 2003 that were a collaboration of many top neurologists and experts in the field. They were research studies specific to NCAA athletics. In sum, the "Acute Effects and Recovery Time" study was conducted because of the "lack of empirical data on recovery time following sport-related concussion" which "hampers clinical decision making about return to play after injury." The study concluded, and the NCAA was clearly on notice of, the fact that collegiate football players "may require several days for

recovery of symptoms, cognitive dysfunction, and postural instability after concussion … ***[f]urther***

***research is required*** to determine factors that predict variability in recover time after concussion."

(emphasis added).  Though the Big 12 and NCAA were well-aware of this and other studies and

the urgent need for this ***further research***, and the need to do whatever it took to protect players

pending the conclusions of that additional research, the NCAA and Big 12 for years essentially

ignored that study and though they had the means to fund and oversee such further research on an

urgent basis, Defendants did nothing  to mitigate player concussion risk for several more years.

86.    The context of the "Cumulative Effects" study was that "approximately 300,000

sport-related concussions occur annually in the United States, and the likelihood of serious

sequelae may increase with repeated head injury." The study concluded that "players with a history

of previous concussions are more likely to have future concussive injuries than those with no

history; 1 in 15 players with a concussion may have additional concussions in the same playing

season; and previous concussions may be associated with slower recovery of neurological

function." Despite this knowledge, the NCAA and Big 12 did not implement a concussion-

management plan policy until 2010, at the earliest.

87.    In 2004, a convention of neurological experts in Prague met with the aim of

providing recommendations for the improvement of safety and health of athletes who suffer

concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date

research. These experts recommended that a player never be returned to play while symptomatic,

and coined the phrase, "when in doubt, sit them out."  The NCAA and Big 12 were aware, or

should have been aware of these recommendations, and did nothing for several more years.

88.    The NCAA released its injury surveillance data for the 2005-2006 football season

and it showed high rates of concussions and head injuries. Specifically, head injuries accounted

for 11% of practice and 5% of game injuries. "Concussions ranked third highest in both practice and competition." In addition, "a team averaging 60 game participants could expect one concussion every five games. Seven percent of all practice and game injuries involved concussions."

89.     The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in former football players and the number of concussions those players had received.

90.     A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

91.     Since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA. Further, based on studies that the NCAA *itself* paid for (as explained in detail below), the NCAA and its member institutions have been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.

92.     As early as 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that there were enduring effects in youth who have experienced a history of two or more concussions.[20] These include decreased overall neuropsychological functioning, as well as decreased mental speed.

---

[20] Moser, *et al.*, Archives of Clinical Neuropsychology, 17 (2002) 91-100.

93.     In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal.[21] The study concluded that *athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities*. Despite this knowledge, the NCAA continued to allow student-athletes to return to play the very next calendar day after sustaining a concussion. In practice, this means that a student-athlete could be back on the field less than 24 hours after sustaining a serious brain injury – thereby placing the student-athlete in serious medical jeopardy.

94.     In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the effects of multiple concussions sustained by a single athlete were examined.[22] The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions. The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football. The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student-athletes should rest before returning to play. Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who desire to continue playing football.

---

[21] McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.
[22] Guskiewicz, *et al.*, *Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

95.     In 2005 UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment ("MCI") and early-onset Alzheimer's disease.[23] In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early on-set Alzheimer's disease. The NCAA and Big 12 knew of should have known of each of these studies, yet chose to ignore them. The NCAA did not even acknowledge the study, let alone act on it or even alert its student-athletes of these known risks.

96.     Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which found that recurrent concussions were linked to a heightened risk of depression in former football players.[24] The results of that study showed that former football players who sustained three or more concussions were three times more likely to be diagnosed with depression.  Those with two or more concussions were one and one-half times more likely to be diagnosed with depression. Consistent with the pattern described herein, the NCAA chose to ignore the fact that the mental health of student-athletes was at risk, implementing no policy or educational stance that would properly protect and/or inform the football players at risk.

97.     Concussions, and their debilitating effects, continue to receive increasing attention. This increased awareness is partly due to the recent and overwhelming publicity and media attention on concussions in professional sports, such as the NFL and NHL, and the long- term effects of such brain injuries. The level of awareness was further escalated by Congressional

---

[23] Guskiewicz, *et al.*, *Association between recurrent concussions and late-life cognitive impairment in retired professional football players*, NEUROSURGERY, Vol. 50, October 2005, at 719.
[24] *Guskiewicz, et al.*, *Recurrent concussions and risk of depression in retired professional football players,* MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

hearings on safety in football held in 2009 and 2010 amid a rash of media coverage on the decline and deaths of several high-profile athletes with a history of head impacts.

98.     In 1969, the National Operating Committee on Standards for Athletic Equipment (NOCSAE) was founded and in 1973, the first safety standards for football helmets were implemented. The Standard Method of Impact Test and Performance Requirements for Football Helmets required the use of a head model that closely simulated the response of the human head to impact. These standards were based on the helmet falling in a guided free fall.

99.     In 1977, the NCAA funded the initial National Survey of Catastrophic Football Injuries, which from 1982 to present has been known as the National Center for Catastrophic Sports Injury Research under the direction of Dr. Fredrick Mueller.

100.     In 1982, the NCAA began collecting standardized injury and exposure data for collegiate sports through its Injury Surveillance System ("ISS"). In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled, "*A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System,*" published by the American Society for Testing and Materials. The article identified concussions as the most prevalent form of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries. The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced."

101.     In 1994, the NFL agreed to fund a committee to study the issue of head injuries in the league. The NFL formed the Mild Traumatic Brain Injury Committee (the "MTBI Committee") to study the effects of concussions and sub-concussive injury on NFL players, and on information and belief, shared the results and data from that study with the NCAA. In 1996, the NCAA Sports

Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports discussed the concussion data in football and other sports and recognized the football helmet would not prevent concussions.

102.    In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

103.    In 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (e) 8 suffered from Alzheimer's disease.  The NCAA and Big 12 knew of or should have known of this study, yet chose to ignore it.

104.    In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part. The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30

through 49." The NCAA and Big 12 knew of or should have known of this study, yet chose to ignore it.

105.    In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

106.    Indeed, the Defendants have known for decades that concussions experienced in football can and do lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, CTE and its related symptoms. During this period of time, no steps were taken either to educate present or former football players regarding the risks of concussions, prevent those concussions, or to provide needed medical care after the athlete's playing career ended.

**E.    The NCAA's and Big 12's Inadequate Rules and Policies Regarding How the Games are Played.**

107.    In the early 1970s, rule-makers in the NCAA recognized that the use of the helmeted head as an offensive weapon was dangerous and was increasing the rate of concussions.

108.    In 1976, the NCAA passed a rule prohibiting initial contact of the head in blocking and tackling in football. Even after the football regulations of the 1970s were passed, however, football student-athletes continued to be coached and trained to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads.

109.    At the individual level, the penalties for student-athletes who make dangerous helmet-based tackles include being either ejected or suspended from play. But at the *team* level, teams are assessed only a 15-yard penalty for dangerous tackling. What is more, the stated rationale behind these penalties has consistently been to protect *the player being tackled* without regard for the player *using* the helmet to make the tackle – as he was coached to do.

110.    Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student-athletes.

**F.    The NCAA's and Big 12's Inadequate Concussion Treatment and Return to Play Rules.**

**1.    From 1994-2002, the NCAA *refuses* to endorse any return-to-play criteria.**

111.    "Concussions and Second Impact Syndrome," (referred to herein as the "Concussion Guideline") first appeared in the 1994-1995 NCAA Sports Medicine Handbook and largely remained the same through 2002. Rather than providing protection for student-athletes or a treatment protocol for member institutions, this Guideline largely left treatment to the individual team's discretion.

112.    For example, while the 1998-99 version of the Concussion Guideline reported that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," the NCAA actually admitted that despite this knowledge, it "does not endorse any specific concussion grading scale or return-to-play criteria."

113.    Moreover, the NCAA did not enforce its Concussion Guideline's statement that: "A student- athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred. In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."

**2.    The NCAA and Big 12 fail to adopt the guidelines promulgated by the 2001 Vienna Conference.**

114.    In November 2001, the first International Symposium on Concussion in Sport was held in Vienna, Austria ("Vienna Conference"). The aim of the Vienna Conference was to provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, football (soccer), and other sports. Experts were invited "to address specific issues of epidemiology, basic and clinical science, grading systems, cognitive assessment, new research methods, protective equipment, management, prevention, and long- term outcome, and to discuss a unitary model for understanding concussive injury."

115.    The result of the Vienna Conference was the publication of an international consensus statement that was "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions" ("Vienna Protocol"). The Vienna Protocol was intended to "be widely applicable to sport related concussion" and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of injured athletes, whether at the recreational, elite, or professional level."[25]/[26] The Vienna Protocol includes direction with respect to each of the following areas in diagnosing and treating concussions: Clinical history; Evaluation; Neuropsychological testing; Imaging procedures; Research methods; Management and rehabilitation; Prevention; Education; Future directions; and Medicolegal considerations.[27]

116.    In fact, the Vienna Protocol recommended specific internationally-accepted return to play guidelines, stating:

When a player shows ANY symptoms or signs of a concussion:

---

[25] "Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med2002; 36:6-7 doi:10.1136/bjsm.36.1.6, *available at* http://bjsm.bmj.com/content/36/1/6.full.
[26] The NCAA possessed a copy of the Vienna Protocol.  NCAA00007999-8012.
[27] *Id.*

(1) The player should not be allowed to return to play in the current game or practice.

(2) The player should not be left alone; and regular monitoring for deterioration is essential.

(3) The player should be medically evaluated after the injury.

(4) Return to play must follow a medically supervised stepwise process.

A player should never return to play while symptomatic. "When in doubt, sit them out!"[28]

117.    The Vienna Protocol also recommended an internationally-accepted return to play stepwise process as follows:

Return to play after a concussion follows a stepwise process:

(1) No activity, complete rest. Once asymptomatic, proceed to level (2).

(2) Light aerobic exercise such as walking or stationary cycling.

(3) Sport specific training – for example, skating in hockey, running in soccer.

(4) Non-contact training drills.

(5) Full contact training after medical clearance.

(6) Game play.

With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. If any symptoms occur after concussion, the patient should drop back to the previous asymptomatic level and try to progress again after 24 hours.

118.    Despite the internationally-accepted consensus guidelines set forth in the Vienna Protocol, the NCAA did not revise the substance of its concussion guideline in the 2002-03 NCAA Sports Medicine Handbook, nor in the 2003-04 Sports Medicine Handbook. In fact, in both

---

[28] Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med 2002;36:6-7 doi:10.1136/bjsm.36.1.6, *available at* http://bjsm.bmj.com/content/36/1/6.full.

identical versions, the NCAA continued to state that there was a "current lack of consensus among the medical community on management of concussions [and thus] the NCAA does not endorse any specific concussion grading scale or return-to-play criteria." The NCAA's position was directly contrary to the consensus set forth in the Vienna Protocol.

119.    In the 2004-05 NCAA Sports Medicine Handbook, the NCAA replaced Guideline 2o with Guideline 2i, entitled "Concussion or Mild Traumatic Brain Injury (mTBI) in the Athlete." While Guideline 2i continued to recommend that students not be allowed to return to play while symptomatic, the NCAA nonetheless approved of absolute discretion being left to the team and student-athlete on when a student should be allowed to return to play. Guideline 2i, in both the 2004-05 and 2005-06 Handbooks, stated in pertinent part:

> The duration of time that an athlete should be kept out of physical activity is unclear, and in most instances, individualized return to play decisions should be made. These decisions will often depend on the clinical symptoms, as well as previous history of concussion, and severity of previous concussions.  Additional factors include the sport, position, age, support system for the athlete, and the overall "readiness" of the athlete to return to sport.

120.    The NCAA's position was, once again, contrary to the Vienna Protocol. In fact, the NCAA outright dismissed the Vienna Protocol in Guideline 2i, instead advocating for individual school decisions stating: "More recent grading systems have been published which attempt to take into account the expanding research in the field of mTBI in athletes. Though it is useful to become familiar with these guidelines, it is important to remember that many of these injuries are best treated in an individual fashion (Cantu '01, Vienna Conference, NATA '04)."

**3.      The NCAA and Big 12 fail to adopt the guidelines promulgated by the 2004 Prague Conference.**

121.    The 2nd International Symposium on Concussion in Sport was held in Prague, Czech Republic in November 2004 ("Prague Conference"), resulting in a revision and update of

the Vienna Protocol ("Prague Protocol").[29] While the return to play guidelines were largely unchanged, the Prague Conference distinguished between simple concussions and complex concussions.[30] The Prague Protocol defined simple concussions generally as those that "resolve without complication over 7-10 days," and complex concussions as those "where athletes suffer persistent symptoms (including persistent symptom recurrence with exertion), specific sequelae (such as concussive convulsions), prolonged loss of consciousness (more than one minute), or prolonged cognitive impairment after the injury."[31]

122.    The Prague Protocol stated that this latter group with complex concussions:

> [M]ay also include athletes who suffer multiple concussions over time or where repeated concussions occur with progressively less impact force. In this group, there may be additional management considerations beyond simple return to play advice.  Formal neuropsychological testing and other investigations should be considered in complex concussions. It is envisaged that such athletes would be managed in a multidisciplinary manner by doctors with specific expertise in the management of concussive injury such as a sport medicine doctor with experience in concussion, sports neurologist, or neurosurgeon.

123.    Thus, building on the return-to-play guidelines in the Vienna Protocol, the Prague Protocol adopted the same stepwise process, but added the admonition that: "In cases of complex concussion, the rehabilitation will be more prolonged, and return to play advice will be more circumspect. It is envisaged that complex cases should be managed by doctors with a specific expertise in the management of such injuries."

124.    Despite the publication of the Prague Protocol in February 2005, the NCAA did not update its Guideline 2i in the 2006-07 Handbook – but repeated Guideline 2i from the prior years.

---

[29] Summary and agreement statement of the 2nd International Conference on Concussion in Sport, Prague 2004, Br J Sports Med2005; 39:196-204 doi:10.1136/bjsm.2005.018614 (Feb. 2005).
[30] "Historically, concussions have been classified with a number of different grading systems. In the Vienna Statement, this approach was abandoned. One of the key developments by the Prague Group is the understanding that concussion may be categorized for management purposes as either simple or complex."  *Id.*
[31] *Id.*

The NCAA thus did not adopt the internationally-accepted guidelines set forth first in 2002 in the Vienna Protocol that were now reaffirmed in the 2005 Prague Protocol. Moreover, the NCAA failed to mandate that student-athletes with concussions be managed by doctors with a specific expertise in the management of such injuries, instead leaving all care to a school's "medical staff."

### 4. The NCAA and Big 12 fail to adopt the guidelines promulgated by the 2008 Zurich Conference.

125.  The 3rd International Symposium on Concussion in Sport was held in Zurich, Switzerland, in November 2008 ("Zurich Conference"), resulting in an update of the Vienna Protocol and Prague Protocol ("Zurich Protocol").[32]

126.  Once again, the Zurich Protocol reaffirmed the need for a graduated stepwise return to play process after a concussion, with a 24-hour wait period between each step.

127.  The Zurich Protocol also reinforced that sport governing bodies, like the NCAA and its member conferences, may need to change their rules and/or enforce the rules in order to protect the well-being of athletes who suffer or show signs of concussions, stating:

> Consideration of rule changes to reduce the head injury incidence or severity may be appropriate where a clear-cut mechanism is implicated in a particular sport. An example of this is in football (soccer) where research studies demonstrated that upper limb to head contact in heading contests accounted for approximately 50% of concussions. As noted earlier, rule changes may also be needed in some sports to allow an effective off-field medical assessment to occur without compromising the athlete's welfare, affecting the flow of the game or unduly penalising the player's team. It is important to note that rule enforcement may be a critical aspect of modifying injury risk in these settings; referees play an important role in this regard.[33]

128.  Despite the publication of the Zurich Protocol in early 2009, the NCAA did not update its Guideline 2i in the 2009-10 Handbook, but repeated Guideline 2i from the prior years.

---

[32] Consensus Statement on Concussion in Sport: the 3d International Conference on Concussion in Sport held in Zurich, November 2008, http://bjsm.bmj.com/content/43/Suppl_1/i76.full.pdf+html.
[33] *Id.*

The NCAA thus did not adopt the internationally-accepted guidelines set forth first in 2002 in the Vienna Protocol, as reaffirmed and explained in the 2005 Prague Protocol and the 2009 Zurich Protocol. In fact, the NCAA did not even discuss in its Guidelines the Prague or Zurich Protocols, but continued to repeat its dismissal of the Vienna Protocol: "More recent grading systems have been published which attempt to take into account the expanding research in the field of mTBI in athletes. Though it is useful to become familiar with these guidelines, it is important to remember that many of these injuries are best treated in an individual fashion (Cantu '01, Vienna Conference, NATA '04)."

5.    **Too little, too late, the NCAA and Big 12 finally begin to require schools to have a concussion plan.**

129.    As previously discussed, the NCAA Sports Medicine Handbook notes that "student-athletes rightfully assume that those who sponsor intercollegiate athletes have taken reasonable precaution to minimize the risks of injury from athletics." This assumption is bolstered by the NCAA's requirement of medical examination prior to participation and the requirement that each student-athlete should be covered by medical insurance.

130.    The *Handbook*'s section on concussions cites to 17 references, dating back to 1991, all documenting the dangers of concussions and the need to carefully assess and treat student-athletes.

131.    Despite this extensive knowledge of the danger of concussion, it was not until April 2010 that the NCAA passed legislation requiring its member conferences and schools to have a Concussion Management Plan ("CMP") in place for all sports. The NCAA did so in reaction to the NFL's concussion policy, as well as the significant liability incurred as a result of the lawsuits being filed against the NCAA and others. The fact that the NCAA and Big 12 waited until nearly nine years after the first international consensus statement on concussions (and still did not meet

the consensus standards) is no surprise. Historically, the NCAA has regulated on the basis of public perception,[34] and courts have largely left the NCAA alone because of the Association's unique position of authority in intercollegiate athletics, and its worthy goal of preserving amateurism.[35]

132.    However, rather than creating a system-wide policy that focused on the best interest of the student-athletes, the NCAA's so-called "plan" for concussion management relies on member schools to self-police their return-to-play policies. Further, the NCAA's plan put the onus of concussion management on the student-athletes by requiring that they "sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions."[36]

133.    Boiled down to its essence, the plan rejects any measure of responsibility for the NCAA, its member schools, and the coaching staff of individual teams; and instead, puts the burden squarely on the shoulders of student-athletes – *the same student-athletes who have just sustained fresh head trauma* – to seek out medical attention, or decide whether to seek it in the first place. Second, the NCAA Plan assumes that NCAA conferences and member institutions understand

---

[34] *See, e.g.*, *Cureton v. NCAA*, 198 F.3d 107, 110 (3d Cir. 1999) (implementing notorious student-athlete academic standards, including minimum GPA, number of core courses, and SAT score, for student-athlete eligibility "in response to the public's perception" that it was needed); *see also* NCAA History, *supra* n.156 (creating NCAA to quell public's concerns over violence in intercollegiate athletics).

[35] In doing so, the NCAA has become almost "an extra-judicial entity, a society unto itself, answerable to no one …." Mitchell Nathanson, *The Sovereign Nation of Baseball: Why Federal Law Does Not Apply to "America's Game" and How It Got That Way*, 16 Vill. Sports & Ent. L.J. 49, 52-3 (2009) (referring to MLB, which has been given "wide latitude" by federal courts and describing MLB as largely "free to govern itself pursuant to its own definition of what is in the best interests of baseball"). Similarly, federal courts been deferential to NCAA rules because of the Association's unique position of authority in intercollegiate athletics, and its worthy goal of preserving amateurism:

> The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act.

*NCAA v. Bd. of Regents*, 468 U.S. 85, 120 (1984).

[36] NCAA Rule 3.2.4.17 (*available at* http://www.ncaapublications.com/productdownloads/D112.pdf).

concussion research, and will supplement and enforce the Plan. However, since the Plan's inception, few member institutions have accepted the NCAA's invitation to do so.

134.    Unlike the comprehensive NFL plan, which provided for specific baseline testing and mandated objective evaluations for athletes, the NCAA plan is skeletal. Rather than directing member institutions to comply with particular procedures, the NCAA plan places the onus of developing the particular means of prevention and management upon NCAA member institutions, almost none of which have stepped forward with a comprehensive, compliant plan. Moreover, the NCAA plan burdens member institutions with the nearly impossible task of identifying when an athlete might have suffered a concussion, and should therefore be removed from play. And, the NCAA plan does not outline any specific stepwise return to play protocol, even though an international consensus had first been reached at the Vienna Conference in 2001 and reaffirmed at the Prague and Zurich Conferences.

**G.    The NCAA's Attempt to Shift the Economic Burden of its Negligence to the Plaintiffs and Class.**

135.    The NCAA requires that every member institution certify that each student-athlete is covered by the student-athlete's or parents' personal insurance coverage or through a basic accident medical policy carried by the institution (or through an institution's formal self- insurance plan).

136.    For any medical care required by a student-athlete that has suffered a concussion or is displaying concussion symptoms, outside of the immediate treatment (if any) provided by the institution's sports medical staff, the NCAA requires that the costs be paid by the student- athlete's or parents' personal insurance or through the institution's plan.

137.    While the NCAA maintains the NCAA Catastrophic Injury Insurance Program, the current $90,000 deductible must first be borne by the student-athlete's or parents' personal

insurance or through the institution's plan.  Moreover, on information and belief and based on the evidence to date, the NCAA Catastrophic Injury Insurance Program has not covered the long- term debilitating effects resulting from repetitive head impacts in intercollegiate sports as described herein. In fact, the NCAA defines "true catastrophic injuries" that would be covered under the NCAA Catastrophic Injury Insurance Program as "relatively rare."[37]

138.     Many injured student-athletes leave the sport burdened by medical bills as there is no uniform NCAA policy requiring that adequate insurance coverage be provided by the school "I thought I would be covered," said Erin Knauer, a *Colgate University* student who piled up $80,000 in medical bills after injuring her back and legs in training for the crew team.  Insurance has covered less than a third of the cost because of the way her condition was diagnosed.  "You never think you're going to rack up that much of a bill."

139.     Other athletes discover their financial problems long after their bodies have healed. An Ohio University football player, temporarily paralyzed during a workout, learned that he still owed $1,800 in unpaid medical bills when he went to buy a car six years after his injury.

140.     The absence of mandated coverage for athletes has prompted calls for change. "That's part of the cost of having an athletic program," said David Dranove, a professor of health industry management at *Northwestern University's* Kellogg School of Management.  "It makes no more sense to tell the athletes, 'You go buy your own *health insurance*,' than it does to say, 'You go buy your own plane tickets and uniform.'"[38]

---

[37]http://www.ncaa.org/wps/wcm/connect/public/NCAA/NCAA+Insurance+Programs/Student+Athlete+Insurance+P rograms/Student+Athlete+Insurance+Programs+Homepage
[38]  http://www.nytimes.com/2009/07/16/sports/16athletes.html?pagewanted=all&_r=0.

H.    **Discovery of the Cause of Action, the NCAA's and Big 12's Fraudulent Concealment and Plaintiffs' Vulnerability.**

141.    When Plaintiffs signed their athletic participation packet neither the NCAA nor Big 12 explain the short- or long-term dangers of concussions or the potential post-college medical expenses they might incur as a result of concussion-related injuries. Defendants did not share with the student-athlete the injury surveillance data they collected or the number of concussions in football for which the Defendants' collected data.

142.    Leading up to August 13, 2010, and over the past four decades, the NCAA has actively concealed any correlation between on-field concussions, its return-to-play policies and the chronic mental illnesses and maladies suffered by former student-athletes, including the Plaintiffs. Indeed, in 1996, a subcommittee of the NCAA observed an increase in concussions and noted that the "football helmet was not designed to protect this type of injury." The NCAA did not warn student football players that their helmets did not protect against concussions and that the NCAA was seeing an increase in concussions.  This is despite the fact an athlete would naturally think of his or her helmet as protective. But the NCAA knew of no "sports helmets … set to prevent concussions."

143.    The discovery of the NCAA's and Big 12's wrongdoing was also delayed due to the players' unequal bargaining power. Unlike the NFL, there is no players' union to study and advocate concerning players' health. Even today, by failing to implement appropriate policies to prevent, manage, mitigate and remedy head injuries and concussions sustained by its student-athletes, the NCAA continues to ignore and actively conceal the repeated warnings and patterns of injury of which the NCAA has actual knowledge.

144.    Prior to passage of the NCAA CMP on August 13, 2010, Plaintiffs were unaware that the conduct of the NCAA with respect to precaution, detection and treatment of concussions

may have caused them to be at an increased risk for developing chronic brain injury symptoms, including, but not limited to, dementia and/or Alzheimer's disease.

145.    Until recently Plaintiffs did not have a reasonable basis to know or believe that the harm was caused by the concealment, neglect and/or misconduct of the Defendants.

146.    Although the debilitating effects of concussions and other head injuries have already manifested for many former student-athletes, there are many others who have sustained such injuries as a direct result of the Defendants' failures and inactivity described above, but whose symptoms have only partially manifested or not yet manifested at all.

147.    The NCAA and Big 12 have failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This has increased the risk of injury that will materialize in the future.

## V.
## CLASS ACTION ALLEGATIONS

148.    Plaintiffs bring Counts I-VI, as set forth below, individually and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All non-excluded persons who participated as collegiate football players at any Big 12 member school at any time between and including the 1990 football season up to and including the 2016 season who are now suffering from long-term brain or neurocognitive injuries or disabilities, or who are more likely than not to develop such injuries or disabilities in the future, resulting from their play as collegiate football players. (The "Class").

Excluded from the Class are the following persons: (i) the NCAA and the NCAA's officers and directors; (ii) the Big 12 and the Big 12's officers and directors; (iii) Class counsel; (iv) the judges who have presided over this litigation; (v) any person or entity that Plaintiffs' counsel is, or may be, prohibited from representing.

149.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

150.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all members of the Class is impracticable.  On information and belief, there are thousands of student-athletes who have been damaged by the Defendants' wrongful conduct as alleged herein. The precise number of members of the Class and their addresses is presently unknown to Plaintiffs. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

151.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Class, including, without limitation:

a.      whether the Defendants engaged in the conduct as alleged herein; and

b.      whether Plaintiffs are entitled to legal and equitable relief, including, but not limited to, payment for personal injuries, lost income, cost of care, medical expenses, and other financial recovery.

152.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all members of the Class are at risk for short- and long-term injuries resulting from concussions and the accumulation of subconcussive hits as a result of the uniform misconduct described above.

153.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the

interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

154.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The costs of current or future testing for diagnostic purposes are relatively small compared to the burden and expense that would be required to individually litigate Class Members' individual claims against the Defendants.  The class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**VI.**
**CLAIMS FOR RELIEF**

**COUNT I**
**BREACH OF EXPRESS CONTRACT**
**(Individually and on Behalf of the Class)**

155.   Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint.

156.   Plaintiffs and the Class members, on the one hand, and the NCAA, on the other hand, were parties to a contract. Each football player, prior to participation as an NCAA athlete, must complete a form where they affirm that they have read the NCAA regulations and the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively "Manual"), that they understand all of the respective NCAA Division Bylaws, and that they will abide by them.

157.   In the Manual, the NCAA promises to perform the following services, *inter alia*, for the student-athletes' benefit:

(a)    "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," NCAA Const., Art.1, § 1.2(a);

(b)    "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

(c)    to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, NCAA Const., Art. 1, § 1.3.2;

(d)    to conduct intercollegiate athletics "in a manner designed to protect and enhance the physical and educational well- being of student-athletes," NCAA Const., Art. 2, § 2.2;

(e)    to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3;

(f)    to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2;

(g)    to "assist the institution in its efforts to achieve full compliance with all rules and regulations…," NCAA Const., Art. 2, § 2.8.2.

158.    For consideration in return for the NCAA's promises, each football player agrees to abide by the Manual and any other NCAA rules, participates in an NCAA sport which provides a benefit to the NCAA and its member institutions, and agrees to waive certain rights, including the right to profit from participation.

159.    The NCAA acknowledges that "**student-athletes *rightfully assume* that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation**."[39]

160.    The Manual thus constitutes a contract between the NCAA, its member institutions and the student-athletes.

---

[39] *Handbook*, at 4 (emphasis added).

161.     The student-athletes have fulfilled their obligations under the contract by providing their services.

162.     The NCAA, and its member institutions, have breached their contractual commitment to provide a safe environment by:

      (a)     failing to educate players concerning symptoms that may indicate a concussion has occurred;

      (b)     failing to warn of the risk of unreasonable harm resulting from concussions;

      (c)     failing to disclose the special risks of long-term complications from concussions and return to play;

      (d)     failing to disclose the role of repeated concussions in causing chronic life-long cognitive decline;

      (e)     failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return-to-play policy to minimize long-term chronic cognitive problems;

      (f)     concealing pertinent facts;

      (g)     failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions including limits on contact practices; and

      (h)     failing to provide long-term insurance coverage for concussion-related injuries.

163.     The NCAA, and its member institutions, have breached their contractual commitment to student-athletes to provide a safe environment in one or more of the following ways:

      (a)     by failing "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," in breach of NCAA Const., Art.1, § 1.2(a), including, but not limited to, by:

            i.     failing to implement or require the implementation of concussion-management practices that met consensus best practices;

     ii.       failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student athlete who was concussed or displayed concussion symptoms to be asymptomatic;

     iii.     failing to require, prior to 2010, that student athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management ;failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

     iv.     leaving discretion of return to play for a student- athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

     v.      failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

     vi.     failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

     vii.    failing to provide appropriate medical care or coverage for costs for medical care for student- athletes who suffered concussions or displayed concussion symptoms.

(b)    by failing "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," in breach of NCAA Const., Art.1, § 1.2(b);

(c)    by failing to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, in breach of NCAA Const., Art. 1, § 1.3.2;

(d)    by failing to conduct intercollegiate athletics "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," in breach of NCAA Const., Art. 2, § 2.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 287(a)(i)-(viii);

(e)     by failing to enforce the requirement that "each member institution []
        protect the health of, and provide a safe environment for, each of its
        participating student-athletes," in breach of NCAA Const., Art. 2, § 2.2.3;

(f)     by failing to enforce the requirement that "each member institution must
        establish and maintain an environment in which a student-athlete's activities
        are conducted as an integral part of the student-athlete's educational
        experience," in breach of NCAA Const., Art. 2, § 2.2; and

(g)     by failing to "assist the institution in its efforts to achieve full compliance
        with all rules and regulations…," in breach of NCAA Const., Art. 2, § 2.8.2,
        including, but not limited to, by failing to provide those services enumerated
        at Paragraph 287(a)(i)-(viii).

164.    As a result of the foregoing, Plaintiffs have been injured, and are entitled to relief.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (Individually On Behalf of the Class)

165.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint
as if fully set forth therein.

166.    To the extent an express contract does not exist, the facts and circumstances set
forth above establish an implied contract wherein student-athletes, in return for participation,
agreed to be bound by NCAA rules and expected the NCAA to provide appropriate rules and
regulations so as to protect their health and safety to the extent possible.

167.    *The NCAA acknowledges that* "student-athletes rightfully assume that those who
sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury
from athletics participation."[40]

168.    The NCAA, and its member institutions, have breached their contractual
commitment to provide a safe environment by:

(a)     failing to implement or require the implementation of a concussion-
        management practices that met consensus best practices;

---

[40] Handbook, at 4 (emphasis added).

(b)     failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(c)     failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(d)     failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(e)     leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(f)     failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(g)     failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

(h)     failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms.

169.    As a result of the foregoing, Plaintiffs have been injured and are entitled to relief.

## COUNT III
## BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiffs and the Class as Third Party Beneficiaries)

170.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

171.    To the extent the Court finds no contract exists, either express or implied, between the student-athlete and the NCAA, then the NCAA and its member institutions were parties to a contract. As an express condition of their membership in the NCAA, each institution must agree

to abide by the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively "Manual"). The Manual thus constitutes a contract between the NCAA and its member institutions.

172.   Plaintiffs and members of the Class are third-party beneficiaries of the contract between the NCAA and its members because the parties to the contract intended to benefit student-athletes and indeed the contract expressly provides for benefits to flow to the student- athlete as part of the "Fundamental Policy of the NCAA":

> 1.2 PURPOSES [*]
>
> The purposes of this Association are:
>
> (a)     To initiate, stimulate and improve intercollegiate athletics programs for student-athletes and to promote and develop educational leadership, physical fitness, athletics excellence and athletics participation as a recreational pursuit;
>
> 1.3 FUNDAMENTAL POLICY [*]
>
> 1.3.1 Basic Purpose. [*] The competitive athletics programs of member institutions are designed to be a vital part of the educational system. A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

173.   The basic principles of the NCAA also benefit the student-athlete.

> 2.2     THE PRINCIPLE OF STUDENT-ATHLETE WELL- BEING [*]
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well- being of student-athletes. *(Revised: 11/21/05)*
>
> 2.2.1    Overall Educational Experience. [*] It is the responsibility of each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience. *(Adopted: 1/10/95)*
>
> 2.2.2    Cultural Diversity and Gender Equity. [*] It is the responsibility of each member institution to establish and maintain an environment that values cultural

diversity and gender equity among its student-athletes and intercollegiate athletics department staff. *(Adopted: 1/10/95)*

2.2.3 Health and Safety. [*] It is the responsibility of each member institution to protect the health of and provide a safe environment for each of its participating student-athletes. *(Adopted: 1/10/95)*

2.2.4 Student-Athlete/Coach Relationship. [*] It is the responsibility of each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach. *(Adopted: 1/10/95)*

2.2.5 Fairness, Openness and Honesty. [*] It is the responsibility of each member institution to ensure that coaches and administrators exhibit fairness, openness and honesty in their relationships with student-athletes. *(Adopted: 1/10/95)*

2.2.6 Student-Athlete Involvement. [*] It is the responsibility of each member institution to involve student-athletes in matters that affect their lives. *(Adopted: 1/10/95)*

174.     The foregoing provisions of the contract are just a small fraction of the contractual provisions that are intended to benefit the student-athlete. Thus the student-athletes are the intended third-party beneficiaries of the contract.

175.     The NCAA and its member institutions have breached the contract in on or more of the following ways:

176.     by failing "to initiate, stimulate and improve intercollegiate athletics programs for student athletes…," in breach of NCAA Const., Art.1, § 1.2(a), including, but not limited to, by:

(a)     failing to implement or require the implementation of concussion-management practices that met consensus best practices;

    i.     failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student athlete who was concussed or displayed concussion symptoms to be asymptomatic;

    ii.     failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

iii.      failing to require, prior to 2010, that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

iv.      leaving discretion of return to play for a student- athlete that had suffered a concussion or displayed concussion symptoms to an individual member's institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

v.      failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

vi.      failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period; and

vii.      failing to provide appropriate medical care or coverage for costs for medical care for student- athletes who suffered concussions or displayed concussion symptoms.

(b)      by failing "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," in breach of NCAA Const., Art.1, § 1.2(b);

(c)      by failing to apply the NCAA's enforcement procedures to member institutions who fail to follow the NCAA's rules, in breach of NCAA Const., Art. 1, § 1.3.2;

(d)      by failing to conduct intercollegiate athletics "in a manner designed to protect and enhance the physical and educational well-being of student-athletes," in breach of NCAA Const., Art. 2, § 2.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 299(a)(i)-(viii);

(e)      by failing to enforce the requirement that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," in breach of NCAA Const., Art. 2, § 2.2.3;

(f)      by failing to enforce the requirement that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," in breach of NCAA Const., Art. 2, § 2.2; and

(g)      by failing to "assist the institution in its efforts to achieve full compliance with all rules and regulations…," in breach of NCAA Const., Art. 2, § 2.8.2, including, but not limited to, by failing to provide those services enumerated at Paragraph 299(a)(i)-(viii).

177.    As a direct result of these breaches, Plaintiffs and members of the Class have been injured and are entitled relief.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(Individually and On Behalf of the Class)**

178.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

179.    Defendants concealed facts and information which were material to student-athletes. As more fully described above, since the early 1970s (as to the NCAA) and since the early 1990s (as to the Big 12), the high incidence of concussions among student-athletes in many different sports, including football, has been well known to the NCAA. Further, based on studies for which the NCAA *itself* paid, the NCAA and Big 12 have been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy. Moreover, in the early 2000s, the NCAA and Big 12 specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.

180.    Through concealment of material facts, the NCAA and Big 12 intended to induce a false belief, under circumstances creating a duty to speak. The NCAA and Big 12 specifically intended to induce a false belief in its student-athletes that they should continue to play and should not be prevented from playing their respective sports even after a concussion or several concussions that should have required time to heal.

181.    For decades, the Defendants, along with others who were employed by them acted in concert to perpetrate the fraudulent concealment of the connection between repetitive MTBI and long-term neuro- cognitive damage, illness, and decline.

182.    Defendants, along with those who participated in the concerted efforts referenced above, knowingly failed to disclose and/or made continuing misrepresentations of material fact that there was an absence of any scientific basis to believe that repetitive MTBI created any known long-term neuro-cognitive risks to collegiate football players. That misconduct by the Defendants exposed Plaintiffs and the Class to an increased risk of brain injury and was the proximate cause of the Plaintiffs' and the Class' brain injuries.

183.    Plaintiffs could not have discovered the truth through reasonable inspection or inquiry, or were prevented from doing so. Plaintiffs were under the care and treatment of the NCAA and school trainers and doctors, and justifiably relied on their silence as representing that the facts did not exist.

184.    The concealed information was such that Plaintiffs would have acted differently if they had been aware of the material facts. Plaintiffs would not have continued to play, or would have taken additional time to allow their brain injuries to heal before returning to play, and/or would have obtained insurance policies that provided long-term coverage. Despite the NCAA's knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

185.    As a proximate cause of the NCAA's concealment, Plaintiffs have suffered personal injuries and/or will suffer future injuries and damages that have not yet fully manifested.

**COUNT V**
**NEGLIGENCE**
**(On Behalf of the Class)**

186.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

187.    At all relevant times, the NCAA and Big 12 had a duty toward Plaintiffs and the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

188.    The NCAA and Big 12 acted carelessly and negligently in their position as the regulatory body for college teams and its student-athletes, including Plaintiffs. Defendants knew or should have known that their actions or inaction in light of the rate and extent of concussions reported and made known to them would cause harm to players in both the short- and long- term.

189.    Defendants were careless and negligent by breaching their duty of due care assumed for the benefit of the Plaintiffs and the Class, both generally and in the following particular respects:

(i)     failing to implement or require the implementation of concussion-management practices that met consensus best practices;

(ii)    failing to implement or require the implementation of medically-supervised stepwise return-to-play criteria with express time requirements for the student-athlete who was concussed or displayed concussion symptoms to be asymptomatic;

(iii)   failing to require that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management;

(iv)    failing to require that student-athletes who suffered a concussion or displayed symptoms of a concussion not be left alone and that medical personnel with specific expertise in concussion diagnosis, treatment, and management regularly monitor the student-athlete for deterioration;

(v)     leaving discretion of return to play for a student-athlete that had suffered a concussion or displayed concussion symptoms to an individual members institution's "medical staff" without regard to whether the staff included physicians or personnel with specific expertise in concussion diagnosis, treatment, and management;

(vi)    failing to implement and/or enforce game rules of play designed to minimize, or that would have the effect of minimizing, head injuries or concussions;

(vii)    failing to police or require member institutions to follow Guideline 2o or 2i, respectively, throughout the Class Period;

(viii)   failing to provide appropriate medical care or coverage for costs for medical care for student-athletes who suffered concussions or displayed concussion symptoms; and

(ix)     other acts of negligence or carelessness that may materialize during the pendency of this action.

190.    Plaintiffs and the Class may have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described above, including but not limited to post-concussion syndrome and Chronic Traumatic Encephalopathy, as well as such symptoms as headaches, dizziness, loss of memory, depression, anxiety, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, loss of the pleasures of life, early- onset dementia, and Parkinsonism, among other things.

191.    As a result of the Defendants' breach of duty, Plaintiffs and the Class have suffered harm described above.

### COUNT VI
### UNJUST ENRICHMENT
### (In the Alternative to Breach of Contract)
### (Individually and On Behalf of the Class)

192.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

193.    Defendants receive significant revenues from the collegiate football played by student-athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

194.    Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they receive at the expense of Plaintiffs and the Class while refusing

to pay for medical expenses incurred as a result of their unlawful actions or otherwise failing to prevent such injuries.

195.    Plaintiffs, on behalf of the Class, seek restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their conduct alleged herein.

## VII.
## DEMAND FOR JURY TRIAL

196.    Plaintiffs demand the causes of actions alleged herein be tried before a jury.

## VIII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final hearing or trial, Plaintiffs have the following:

a.  Class Certification as set forth herein, with Plaintiffs as Class Representatives, and Plaintiffs' counsel as Class Counsel;

b.  Monetary Judgment against Defendants for a sum within the jurisdictional limits of this Court for all actual damages, both past and future, as indicated above;

c.  Prejudgment interest as provided by law;

d.  Post-judgment interest as provided by law;

e.  Attorney's fees;

f.  Costs of suit; and

g.  Such other and further relief, at law and in equity, to which they may show themselves to be justly entitled.

Respectfully submitted,

*/s/ Vincent P. Circelli*
Vincent Circelli*
vinny@cwylaw.com
**CIRCELLI, WALTER & YOUNG, PLLC**
Tindall Square Warehouse
500 E. 4th Street, Suite 250
Fort Worth, Texas 76102
(682) 703-2246 telephone

*Pro Hac Vice* Application Filed